# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 1, 2016

## IN RE KENNETH G.[1]

### Appeal from the Circuit Court for Dekalb County
### No. 2014CV70     Amy V. Hollars, Judge

---

### No. M2016-00380-COA-R3-PT – Filed September 15, 2016

---

This appeal involves the termination of a father's parental rights to his minor child. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of his rights on the statutory grounds of abandonment for failure to visit and to support the child. The court further found that termination was in the best interest of the child. The father appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, P.J., M.S., and KENNY ARMSTRONG, J., joined.

Daniel Barnes, Sparta, Tennessee, for the appellant, Mark C.

Herbert H. Slatery, III, Attorney General and Reporter, and Rachel E. Buckley, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

## I.     BACKGROUND

Kenneth G. ("the Child") was born to Lois G. ("Mother") in September 2010. Carlos G. is listed on the Child's birth certificate. The Child and his five siblings, Jacob, Morgan, Jerry, Taylor, and Harley, (collectively "the Children") resided with Mother and Carlos until January 2, 2011, when it was discovered that Morgan had been severely

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

abused. The Tennessee Department of Children's Services ("DCS") removed the Children and placed them with Floyd and Bonnie C.[2] (collectively "the Guardians").

Meanwhile, DCS filed a notice of DNA testing that identified Mark C. ("Father") as the Child's biological father. Father acknowledged his paternity and entered into an agreed order of parentage. He also participated in the development of two permanency plans, one on January 19, 2012, and another on May 4, 2015. Pursuant to the 2012 plan, Father was required to (1) comply with the rules of his probation and refrain from incurring additional charges; (2) complete parenting classes; (3) complete a mental health assessment, follow recommendations, and sign a release of information; (4) submit to random drug screens and complete an alcohol and drug assessment if indicated; and (5) maintain a suitable home and a legal source of income. He also signed a Criteria and Procedure for Termination of Parental Rights on January 19, 2012, and again on May 1, 2015, indicating that he had received a copy of the form and had been given an explanation of its contents.

The court awarded permanent guardianship to the Guardians on June 15, 2012. Father, along with Mother, were directed to schedule visitation "through good faith scheduling" with the Guardians, who were tasked with supervising such visitation for a minimum of 16 hours per month.

In June 2014, DCS filed a petition for emergency custody and to declare the Children dependent and neglected. DCS alleged that Bonnie had placed Jacob into foster care, had placed Taylor in the care of a local educator, and had placed Morgan with DCS on a temporary basis for respite care. DCS claimed that she also violated the original order by permitting unsupervised visitation and that Carlos had sexually abused Morgan on a number of occasions while presumably under Bonnie's supervision. DCS further claimed that Bonnie abused the Children and showed specific cruelty toward Morgan. The Child, along with Harley, Jacob, Jerry, and Morgan, were placed into DCS custody, while Taylor was placed with another individual. Father was awarded supervised visitation with the Child and given notice of the requirement to remit child support.

On September 8, 2014, DCS sought termination of Father's parental rights to the Child based upon the following three grounds: (1) abandonment for failure to visit; (2) abandonment for failure to remit child support; and (3) the persistence of conditions which led to removal. DCS also claimed that termination of his rights was in the best interest of the Child. DCS later petitioned to suspend Father's visitation with the Child.[3]

---

[2] Bonnie C. is the paternal grandmother to Harley.

[3] Mother and Carlos voluntarily surrendered their parental rights to the Child.

The hearing on the termination petition was held on September 8, 2015. Angela Brown testified that she is employed by DCS as a team leader and that she had been assigned to supervise the Child's case managers. She also regularly attended child and family team meetings and specifically recalled attending meetings in August 2014, in March 2015, and in April 2015. She claimed that Father did not produce any clothes or gifts for the Child during the meetings. She characterized Father as "nice" and attentive but asserted that he never provided proof of completion of the permanency plan requirements. Ms. Brown expressed doubt as to whether Father was capable of caring for the Child, who required specialized care and attention.

Sharon Smith testified that she had been employed by DCS as a case manager until her retirement on June 30, 2015, and that she was assigned to the Child's case. She recalled providing Father with a copy of the Criteria and Procedure for Termination of Parental Rights on January 19, 2012, and again on May 1, 2015. She stated that she reviewed the contents of the document with him on both occasions and that he indicated his understanding of the document. She stated that she assisted Father in completing the permanency plan requirements by scheduling random drug screens, a mental health assessment, a parenting assessment, and an alcohol and drug assessment. She asserted that he did not attend the alcohol and drug assessment. She claimed that he also failed drug screens or refused to comply and that he never established his ability to provide a suitable home. She explained that Father's brother, who had a lengthy criminal history, resided with him. She asserted that Father also failed to visit the Child on a regular basis from January 2011 through June 2012, before the Guardians received permanent guardianship of the Child.

Ms. Smith testified that Father exercised his right to visitation on two occasions during the relevant time period after the Child was placed back into DCS custody, once on July 30, 2014, and again on August 29, 2014. She recalled that Father did not provide any food for the Child during the scheduled visitations. She claimed that Father brought other children to the visits and simply watched the Child play with them. She agreed that he engaged with the Child on occasion but claimed that she did not observe an emotional bond between the Child and Father. She asserted that he failed to maintain contact with her on a consistent basis following the final visit and that he failed to complete the permanency plan requirements. She noted that he was still living with his parents in January 2015.

Cathy Cavender testified that she is employed by Camelot as a treatment coordinator and that she had been assigned to supervise the Child's case manager. She explained that the Child suffered from a medical condition similar to hydrocephalus. She stated that the Child attended numerous medical appointments to address his condition and that he also received specialized services to address his delay in speech. She stated

that the Child resided in a pre-adoptive foster home with his brother, Jerry. She provided that the family had expressed a desire to adopt the Child.

Emily Olivares testified that she is employed as a speech pathologist and had been working with the Child since June 2015 on a twice weekly basis. She stated that the Child's foster mother accompanies him to the appointments. She provided that Father had not attended an appointment even though his attendance would be permitted. She believed that the Child evidenced signs of improvement but explained that he would likely continue to experience challenges that necessitated continued treatment as he advanced in school.

Rebekah B. ("Foster Mother") testified that the Child and his brother, Jerry, were placed in her home. She expressed a desire to adopt the Child and Jerry if they were to become available for adoption. She provided that the Child and Jerry shared a room and evidenced signs of a strong sibling bond. She acknowledged that the Child suffered from a condition known as idiopathic intracranial hypertension, which caused development delays. She believed he had evidenced signs of improvement while in her care but agreed that he would likely need specialized care and attention on a long-term basis. She provided that she was willing to care for the Child and address his unique needs. She stated that Father never provided clothes or toys for the Child even though she met him on occasion at child and family team meetings.

DCS read portions of Father's deposition into the record in lieu of calling him as a witness.[4] As pertinent to this appeal, Father testified that he was employed by Yorozu Manufacturing ("Yorozu") and had been working there for approximately five months. He received payment at a rate of $9.35 per hour. He stated that prior to working for Yorozu, he worked for Jewel's Construction ("Jewel's") and received payment at a rate of $8 per hour. He stated that he lived with his parents and remitted payment for rent at a rate of $300 per month. He agreed that he owned a 2004 Chevy Tahoe in 2014 but asserted that he allowed his former fiancé to assume liability for the payments because she needed transportation. He relied upon his parents to take him to work and appointments in exchange for money for gasoline.

Father testified that he has four children, including the Child at issue. He conceded that he lost custody of one of his children based upon his conviction of a Class E felony. He provided that he completed his sentence before the Child's birth. He could not provide information concerning the Child's medical condition but stated that the Child attended numerous medical appointments.

---

[4] Rule 32.01(2) of the Tennessee Rules of Civil Procedure provides that the deposition of a party "may be used by an adverse party for any purpose."

Father agreed that he did not remit payment for child support to Bonnie prior to the Child's return to DCS custody. He explained that he was not required to remit payment and asserted that he provided clothing and other items for the Child during that time. He asserted that he was also never instructed to remit payment for child support to the State once the Child returned to DCS custody.

Relative to visitation, Father claimed that Bonnie prevented his attempt to visit the Child from February 1, 2014, through June 16, 2014. He claimed to have "a whole closet full of clothes" he purchased for the Child during that time period. He agreed that he never reported Bonnie's failure to permit visitation. He explained that his house was destroyed by fire in that time period. He stated,

> [E]verything was happening within that time period. It really didn't register on me about [the Child] then because I'd just lost everything. I had lost my animals and everything in that house fire, and I really didn't – anything really didn't come across my mind about [the Child] at that time.

He agreed that he also did not attempt to schedule visitation with the Child from June 16, 2014, through September 8, 2014. He explained,

> I was working[,] and I didn't hardly do any kind of – I didn't – it honestly didn't cross my mind until it was too late.

He conceded that he had not provided any gifts or items for the Child since the Child's return to DCS custody.

Bonnie, one of the Guardians, testified by deposition that she was awarded permanent guardianship of the Child from June 15, 2012, through June 16, 2014. She recalled that Father last visited the Child in July 2012. She provided that her residence and telephone number remained unchanged but that he never requested visitation after the final visit. She stated that Father also never remitted payment for child support or provided gifts for the Child.

Father testified on his own behalf at trial that he had been unable to maintain consistent employment. He explained that he was injured in a house fire in January 2014. He stated,

> I couldn't find no work until about six months after the house fire. And I worked probably two days a week with [Jewel's], and then I went to Yorozu for the first time and worked for Yorozu for a little while. And I got temporarily laid off there. I went to work for Israel [Malingo] and done

some roofing for him for almost four or five months, about six days a week. But he just slowed down to nothing.

He conceded that he actually returned to work in March 2014 but explained that he was "on light duty." He provided that he currently works on a paving crew for approximately 40 hours per week at a rate of $8 per hour. He stated that he lives with his parents and remits payment for rent at a rate of $300 per month.

Relative to visitation and child support, Father testified that he scheduled visitation through Bonnie every weekend for approximately four months, beginning in June 2012. He claimed that Bonnie refused his attempts to schedule visitation after that time. He provided clothing, toys, and diapers each weekend in lieu of child support. He conceded that he had not remitted payment for child support since he learned of the Child's return to custody in August 2014.

Father testified that one of his four children, Brandon, suffers from a medical condition that requires specialized treatment and individualized care and attention. He claimed that he had accompanied Brandon to numerous medical appointments and asserted that he was willing and able to provide the same care and attention for the Child.

Father testified that he completed his parenting classes. He agreed that he had not provided proof of completion of the parenting classes but explained that he was unable to remit payment for a copy of the certificate. He claimed that he maintained contact with DCS and returned Ms. Smith's telephone calls on a consistent basis. He also claimed that DCS failed to assist him in scheduling his alcohol and drug assessment.

Sharon C., the paternal grandmother, recalled observing Father with the Child and described a loving relationship between them. She stated that Father regularly exercised visitation until Bonnie refused his attempts to schedule visitation. She confirmed Father's testimony that he was injured in a house fire. She stated that he was "fully healed" approximately two weeks after the fire.

Following the hearing, the trial court found clear and convincing evidence to support termination based upon the statutory grounds of (1) abandonment for failure to visit and (2) abandonment for failure to remit child support. The court also found clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.      Whether clear and convincing evidence supports the court's termination based upon a finding of abandonment for failure to visit and to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

B.      Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1)      [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)      [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, -- S.W.3d --, No. M2014-00453-SC-R11-PT, 2016 WL 819593, at *12 (Tenn. Jan. 29, 2016) (internal citations omitted).

## IV. DISCUSSION

### A.

In terminating Father's parental rights based upon the statutory ground of abandonment, the court considered his failure to visit and remit support for the four months preceding September 8, 2014, the filing date of the termination petition. The relevant time period was May 8, 2014, through September 7, 2014.[5]

A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(c). A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). This court has consistently held that the term willfulness as it applies to a party's failure to visit or remit support must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64.

Relative to visitation, Father argues that he was prevented from exercising his right to visitation by Bonnie and then by DCS. He claims that he was unable to enforce his right to visitation because he could not afford to hire an attorney. DCS responds that termination on this ground was supported by clear and convincing evidence when Bonnie contradicted his testimony and when DCS consistently pursued Father to schedule visitation following the Child's return to DCS custody.

The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond

---

[5] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

his control, did not willfully abandon his child." *In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted). In *In re A.M.H.*, the Court was "presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody [ ] during the 'abandonment' period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights." 215 S.W.3d at 810.

While Father may have been unable to hire an attorney, he never attempted to contact DCS to report Bonnie's refusal to schedule visitation. The Child's prolonged abuse and neglect could have been resolved at a much earlier date had he initiated such contact. Moreover, the record reflects that DCS pursued him to schedule visitation once the Child returned to DCS custody. However, Father only engaged in token visitation with the Child on two occasions during the relevant time period. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Father abandoned the Child by willfully failing to visit during the relevant time period and that a statutory ground existed for termination of his parental rights.

Relative to child support, Father argues that his failure to remit support was not willful when he was unable to maintain consistent employment during the relevant time period. He claims that DCS failed to establish his ability to remit payment when he was impoverished and unable to care for himself. DCS responds that the record supports termination on this ground when Father was capable of working and was employed during the relevant time period.

"A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacob M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (citation omitted). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). We acknowledge Father's difficulty in maintaining consistent employment and his status as an indigent defendant. However, this was not a case where a parent had extenuating circumstances but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Father never paid child support throughout the entirety of the Child's lifetime even when he was actually employed at various times. Father even testified that he failed to schedule visitation during the

relevant time period because he was working. While he claims that he never received sufficient income to support himself and the Child, the record belies his assertion. Father testified that he was responsible for a car payment throughout 2014 until he finally surrendered the car to his former fiancé. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Father abandoned the Child by willfully failing to remit child support during the relevant time period and that a second statutory ground existed for termination of his parental rights.

## B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate Father's parental rights, we must consider whether termination was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[6]
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[6] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Father. He had not made the adjustment of circumstances necessary to make it safe and in the Child's best interest to return home. Indeed, the record reflects that Father lived with his parents and brother, who had a criminal history, at the time of trial. Tenn. Code Ann. § 36-1-113(i)(1), (7). Relative to DCS's efforts, the record was replete with information concerning the effort to assist Father. Having reviewed the evidence, we conclude that DCS expended more than reasonable efforts in attempting to assist him but that he simply failed to make a lasting adjustment. Tenn. Code Ann. § 36-1-113(i)(2). Father failed to maintain consistent visitation, and the record reflects that a meaningful relationship was not otherwise established between him and the Child. Tenn. Code Ann. § 36-1-113(i)(3), (4).

The Child resides in a safe and stable foster home that is willing and able to address his medical needs while allowing him to maintain a sibling bond with his half-brother. Removing him would negatively affect his emotional and medical condition. Tenn. Code Ann. § 36-1-113(i)(5). Father never remitted payment for child support. Tenn. Code Ann. § 36-1-113(i)(9).

While we acknowledge Father's love for the Child and his desire to maintain his biological connection, the Child has simply languished in custody for far too long and should be allowed to achieve permanency and stability in his current placement. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child. We affirm the decision of the trial court.

## V.    CONCLUSION

This judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Mark C.

_____
JOHN W. McCLARTY, JUDGE